Matthew D. Thayne (Bar No. 9424)
**PHILLIPS RYTHER & WINCHESTER LLC**
124 South 600 East
Salt Lake City, Utah  84102
Telephone: (801) 935-4935

*Attorneys for Hand Out Gloves LLC*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| HAND OUT GLOVES LLC, a Utah limited liability company,<br><br>          Plaintiff,<br>v.<br><br>ERIC VAUGHN dba VO GLOVES, an individual, and VAUGHN OUTDOOR, LLC, a Utah limited liability company,<br><br>          Defendants. | **COMPLAINT**<br><br>Case No. 2:17-cv-0052-PMW<br><br>Magistrate Judge Paul M. Warner |

**COMPLAINT**

Plaintiff Hand Out Gloves LLC ("HAND OUT" or "Plaintiff") hereby complains against defendants Eric Vaughn and Vaughn Outdoor, LLC ("Vaughn Outdoor") (collectively, "Defendants"), and for its causes of action alleges as follows:

**PARTIES**

1.   HAND OUT is a limited liability company organized and operating under the laws of the state of Utah with its principal place of business located at 8679 South Sandy Parkway, Suite B, in Sandy, UT 84070.

2. HAND OUT is in the business of designing, manufacturing, and selling gloves and mittens, such as gloves and mittens for skiing, snowboarding, and other winter sports, along with various other clothing items and accessories.

3. Upon information and belief, defendant Eric Vaughn is an individual residing in Sandy, Utah.

4. Defendant Vaughn Outdoor is or was a limited liability company organized and operating under the laws of the state of Utah with an address of PO BOX 171285, Salt Lake City, Utah 84117.

5. Upon information and belief, defendant Eric Vaughn has personally done business and continues to personally conduct business under the names VO Gloves and VO Gloves, Inc.

6. Upon information and belief, VO Gloves, Inc. is not a legitimate business entity.

7. Defendants Eric Vaughn and Vaughn Outdoor have been and/or currently are direct competitors of HAND OUT in the business of winter sports gloves and mittens.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over the subject matter of Count I of this action under 15 U.S.C. § 1121 and 28 U.S.C. § 1331.

9. This Court has supplemental jurisdiction over the subject matter of Counts II and III of this action under 28 U.S.C. § 1367.

10. Defendants are subject to personal jurisdiction in this judicial district because they reside in Utah and because they have purposefully availed themselves of Utah law by establishing and/or maintaining and operating businesses within the State of Utah. Defendants have also perpetrated torts against Plaintiff from within the State of Utah and have caused harm to Plaintiff within the State of Utah.

11.   Venue is proper in this Court under 28 U.S.C. § 1391 because Defendants actually reside in this judicial district and/or because a substantial part of the events giving rise to the claims occurred in this judicial district.

## GENERAL ALLEGATIONS

12.   HAND OUT is an innovator and rapidly growing company in the winter sports apparel industry.  More particularly, HAND OUT designs, manufactures, and sells winter gloves and mittens, along with various other clothing items and accessories.  HAND OUT's primary line of products, gloves and mittens, allow wearers to remove their hands without removing the gloves.  HAND OUT's proprietary technology improves the ability of the gloves to be opened and closed and, in some cases, allows the gloves to be secured either in an open or closed configuration.

### *HAND OUT's First Patent Application and Its Progeny Are Denied*

13.   Defendant Eric Vaughn formerly held a partial ownership interest in HAND OUT.

14.   On or about May 18, 2005, while defendant Eric Vaughn was a part-owner in HAND OUT, a patent application was filed titled "Convertible Hand Covering System."  This patent application was filed under U.S. Patent Application Serial No. 11/133,069 (the "First Patent Application") and listed Eric Vaughn as the inventor.

15.   The First Patent Application was rejected by the United States Patent and Trademark Office ("USPTO") and ultimately abandoned on or about July 11, 2008.

16.   A continuation patent application claiming priority to the First Patent Application was filed on or about March 17, 2008 under U.S. Patent Application Serial No. 12/077,538.

17.   This continuation patent application was also rejected by the USPTO and ultimately abandoned on or about March 22, 2011.

18. A second continuation patent application claiming priority to the continuation patent application and the First Patent Application was filed on or about February 22, 2011 under U.S. Patent Application Serial No. 13/032,468.

19. This second continuation patent application was also rejected by the USPTO and ultimately abandoned on or about July 26, 2012.

### *Eric Vaughn Sells His Ownership Interest in HAND OUT*

20. In an executed agreement dated November 12, 2014 (the "Business Sale Agreement"), defendant Eric Vaughn sold his entire ownership interest in HAND OUT back to the company.

21. As of the date of the Business Sale Agreement, defendant Eric Vaughn had no ownership interest in HAND OUT or any of its intellectual property assets or other assets.

22. Neither of the Defendants currently has any ownership interest in HAND OUT or any of its intellectual property assets or other assets.

### *HAND OUT Improves Its Technology and Files New Patent Applications*

23. After buying out Mr. Vaughn, HAND OUT improved the technology underlying its glove and mitten products.

24. On or about February 27, 2015, HAND OUT filed a provisional patent application to attempt to protect these improvements. This provisional patent application was filed under provisional application No. 62/121,877.

25. A non-provisional patent application directed to these improvements in HAND OUT's technology was filed on or about February 23, 2016. Jake L. Sullivan and Donahue Wildman were the two inventors listed on this patent application, which is currently pending

before the USPTO.  Mr. Sullivan is the President of HAND OUT and Mr. Wildman is an investor.

26. The disclosure materials contained in the First Patent Application and its subsequent continuation filings were cited to the USPTO in an Information Disclosure Statement filed on or about June 6, 2016.

## *HAND OUT's Post-Vaughn Successes*

27. Following the departure of Mr. Vaughn from the company, HAND OUT not only improved its technology and filed new patent applications, but also achieved several significant milestones in expanding its business.

28. HAND OUT was recently invited to a recording of the television series *Shark Tank™*, which is a reality TV show featuring a panel of investors who hear pitches from entrepreneurs and business owners for investments in their company and/or business plan.

29. Although not every recorded episode of *Shark Tank™* is ultimately broadcast, HAND OUT's episode was broadcast on ABC™ on December 9, 2016.

30. During HAND OUT's episode on *Shark Tank™*, the impression was given that HAND OUT reached an agreement with one of the investors, namely, Barbara Corcoran, in which Ms. Corcoran would receive an equity position in HAND OUT.

31. Notwithstanding the handshake deal depicted on HAND OUT's episode of *Shark Tank™*, this agreement was not finalized and, as of the date of the filing of this complaint, has not yet been finalized.

32. It is common for investors to conduct due diligence on companies following a handshake deal and many investments that appear to have been made on television on *Shark Tank™* eventually fall through.

33. Since the airing of HAND OUT's episode on *Shark Tank™*, HAND OUT's sales have increased substantially.

### *Vaughn Regrets His Decision to Sell His Interest in HAND OUT and Repeatedly Attacks the Company and Its Principals*

34. Shortly after the airing of HAND OUT's episode on *Shark Tank™*, Mr. Vaughn began to distribute libelous misinformation about HAND OUT, its owners and/or officers, and, eventually, even *Shark Tank™* itself.

35. The following are examples of the types of public statements Mr. Vaughn made about HAND OUT and its owners/officers:

- "***He** [Jake Sullivan] **will be known as a thief, and very dishonest**.*"

- "***Sorry, Jake** [Sullivan] **and Don** [Wildman], **you guys are lower than low to try and claim my invention as your own. How dumb can you be? These gloves have been being sold for over a decade, you think it will fly that you came up with the idea.***"

- "*It will be tough when all you friends and family, who don't already know that you stole it from me, find out about how dishonest you have been.*"

- "*So lying to Shark Tank, lying to all who watched the show, lying to everyone who thinks it is their idea, I am just exposing them.*"

- "*There are these awesome new gloves call Hand Out Gloves that were just on Shark Tank, and these guys invented these awesome glvoes and I just want everyone to know how awesome they are!!!!! Except they didn't invent them, they lied on national TV on Friday night that they came up with this idea and were able to make a deal with Barbara Corcoran, one of the Sharks. They even told Barbara that they had filed for a patent for the gloves. Unfortunately they*

*won't be able to get a patent. . . . Eric is still the inventor, and he didn't appreciate thieves trying to take credit for his idea, on national TV the other day.*"

- "*Well, I am not asking for money from these guys, I legitimately sold my portion of the company. I'm just calling them out for lying and taking credit for something they didn't do, and for trying to steal my 25% ownership in the first place.*"

- "*The idea* [behind HAND OUT's patent application] *is common knowledge now, they won't be able to get one* [(a patent)]."

- "*To be honest, I did sell my percentage of the company to these guys, but that was after a year of trying to reach an agreement, and after they tried to steal my 25%. Doesn't change the fact that they lied about it and said it was their idea.*"

- "[J]*ust trying to warn you so you know there will be no patent that these Hand Out Gloves will be able to get, this is all prior art, this exact glove has been being sold for over a decade. They are a lying joke. Other thieves have gone on Shark Tank as well, who have stolen ideas, and tried to claim them as their own.*

  *If these two didn't want to compete against me in the future, which is their intent with applying for a new patent, then they should have addressed that when they bought me out of my 25% ownership. See? More lying and deceit by these guys. Dishonest all the way around*."

## *Vaughn Interferes with HAND OUT's Prospective Economic Relations with Shark Tank™ and Barbara Corcoran*

36. Mr. Vaughn also sent a message to Barbara Corcoran herself. This message read as follows:

"*Hey Barbara, my name is Eric Vaughn. I am the inventor of the Handout gloves, I came up with the idea over 12 years ago. I started the patent process and did all the work to get these into production. I had investors, and they pulled out when we were not able to get the patent issued. I called them CZiP gloves. I started the company again about four years ago with Jake Sullivan, Don Wildman and his son Jon Wildman. Each of us had 25% ownership of the company. I came up with the new name "HandOut" and it was not Jake or Don who came up with this idea.*
*I quickly found out that working with Jake was not going to be a good fit. He let me know that I had been kicked out of the company, and that they were going to do HandOut Gloves, and I could just go and do my own thing. I let this deceitful kid know that I owned 25% and that he couldn't kick me out. He said we had not signed any agreements so I didn't have any ownership. We had set up the company with the 25% each ownership, and it was on the books, he just didn't want to acknowledge that he didn't know what he was talking about.*
*It took me about a year to finally have them buy me out of my 25% ownership, for a very small amount, considering this company would not be around had it not been for me, my idea, my design, the name I came up with, all the work I had done in getting a manufacturer for these gloves, the 3 times I went to China to meet with my manufacturer, etc. Anyway, they bought me out and that is that. But I just want to let*

*you know that Jake Sullivan is not a trustworthy person, and that Don Wildman does not have the money he says he does, why would they go on Shark Tank, and give away 25% of the company, for $300K?*

*Also, they will NOT be able to get a patent on these gloves, it is already out there and in the market, I even wasn't able to get one because of some patent filed back in the 40's that was the only one similar. I just smiled to watch all of you put the gloves on and see my idea out there, and I love seeing the smiles of people who have had the gloves for years and years, from my company I had, and how much they love my idea. Now I see these guys, Jake and Don, going onto Shark Tank and taking credit for my invention, as if they came up with it themselves. Complete A__holes if you ask me.*

*So Barbara, I think you are a great person, and you are my favorite Shark, so I wanted to let you know that these guys are dishonest and that they lied to you, and everyone else watching, that they came up with this idea, and that they will be able to get a patent, they absolutely, definitely will not.*

*Please feel free to contact me with any questions, or if you would like to go into business with the actual inventor, and I will be able to do a lot more than these guys have in the past four years. Don Wildman has $100M and these gloves aren't already in every store, everywhere? BS.*

*And if you need proof, here is the patent I filed back in 2005. These gloves are also already being sold in a number of countries in Europe, under my first name I came up with, CZiP, under the company called 10 Peaks. Look it all up, you will see everything I have said is true. My passion is the mountains, specifically in the winter, and that is why I came up with these incredibly useful gloves and mittens. Ask Jake and Don if*

*you can see the very first pair that they did... Ha! Ask them how they came up with the idea. Would love to see the look on their faces. I'm glad all those who have commented also see the utility of this zipper put on the back of the glove. They really are great*."

37.  On information and belief, the message referenced above in Paragraph 36 was intentionally designed to disrupt HAND OUT's economic relationship, both existing and prospective, with Barbara Corcoran and/or the other investors, producers, and others involved in the Shark Tank™ television series, as well as the consuming public in general who purchase HAND OUT's products, and to cause economic harm to HAND OUT.

38.  Mr. Vaughn followed up his message to Barbara Corcoran with another message as follows:

"*Oh and one other thing, I can't count how many times I have been told by people that I should go onto Shark Tank with my gloves. I would have done it, but since I didn't have a patent, I knew that is a deal breaker, so I never attempted to go on. These guys didn't see it as a problem, apparently. Just lie about it and it should all work out. I just can't do that, I need to be able to sleep at night knowing I am not being dishonest and stealing from other people*."

39.  Mr. Vaughn used improper means in intentionally interfering with HAND OUT's relationship with Barbara Corcoran at least in that Mr. Vaughn misrepresented facts in his statements to Ms. Corcoran, used defamation and/or disparaging falsehoods, and in that Mr. Vaughn's actions in interfering with this relationship were contrary to both statutory and common laws.

## *Vaughn Attempts to Divert Sales From HAND OUT to Himself By Way of Publicizing Disparaging Falsehoods*

40. In connection with several of Mr. Vaughn's untruthful statements about HAND OUT and its owners and/or officers, Mr. Vaughn repeatedly mentioned that he was selling a competitive product and, on several occasions, included links to his website—vogloves.com.

41. In connection with Mr. Vaughn's attempts to divert customers away from HAND OUT and to his competitive product, Mr. Vaughn also publicly stated:

- "*I saw their* [HAND OUT's] *gloves at REI*.  [HAND OUT's more expensive gloves are] *my design 100%*."
- "*they* [HAND OUT] *cut corners and are selling a crappy product* . . . ."
- "*I wouldn't sell a crappy product that was just an attempt to cut corners to make an extra buck*."

## *Vaughn's Misconduct Results in Further Disruption to HAND OUT's Business*

42. During Mr. Vaughn's barrage of public statements about HAND OUT and its owners and/or officers, other incidents of disruption to its business occurred.  For example, HAND OUT was contacted by one of its distributors regarding concerns about Mr. Vaughn's public statements and some responses to those statements about the possibility of having its products "shut down in Japan."

43. Mr. Jake Sullivan, HAND OUT's President, received this communication from its distributor.  After having read one or more of Mr. Vaughn's posts, the distributor expressed to Mr. Sullivan that Mr. Vaughn's comments left him with the impression and concern that HAND OUT's products may be in violation of Mr. Vaughn's intellectual property rights.

**FIRST CLAIM FOR RELIEF**
**(UNFAIR COMPETITION – 15 U.S.C. § 1125(a))**

44. HAND OUT hereby realleges and incorporates herein the allegations above.

45. Defendants made one or more false statements of fact and/or statements that are likely to mislead, confuse, or deceive, in commercial advertisements.  Non-limiting examples of such statements are as follows:

- "I saw their [HAND OUT's] gloves at REI.  [HAND OUT's more expensive gloves are] my design 100%."

- "They [HAND OUT] cut corners and are selling a crappy product . . . ."

- "Jake Sullivan is not a trustworthy person, and that Don Wildman does not have the money he says he does . . . ."

- "[T]hey will NOT be able to get a patent on these gloves, it is already out there and in the market"

- "Now I see these guys, Jake and Don, going onto Shark Tank and taking credit for my invention, as if they came up with it themselves."

46. Defendants' false or misleading statements misrepresented the nature, characteristics, and/or qualities of HAND OUT's goods and/or commercial activities.

47. Defendants' false or misleading statements either deceived or had the capacity to deceive a substantial number of potential consumers and/or customers.

48. Defendants' false or misleading statements were material at least in that these statements were likely to influence consumers' and/or customers' purchasing decisions, including consumers and/or customers of Defendants' products and potential consumers and/or customers of HAND OUT's products.

49.  Both HAND OUT's products and, on information and belief, Defendants' products referenced in one or more of their false or misleading statements, have been offered for sale and/or sold in interstate commerce within the United States.

50.  As a direct and proximate result of Defendants' actions, HAND OUT has sustained and will continue to sustain, substantial injury, loss, and damages in an amount to be proven at trial, along with HAND OUT's attorneys' fees and costs.

51.  On information and belief, Defendants' false or misleading statements were intentional and willful.

52.  As a direct and proximate result of Defendants' conduct, HAND OUT has been irreparably harmed in its business.  Moreover, HAND OUT will continue to suffer irreparable harm unless Defendants are restrained from making further false or misleading statements, as set forth above.

53.  HAND OUT has no adequate remedy at law that will compensate it for the continued and irreparable harm it will suffer if Defendants' conduct is allowed to continue.

**SECOND CLAIM FOR RELIEF
(INTENTIONAL INTERFERENCE WITH
ECONOMIC RELATIONS)**

54.  HAND OUT hereby realleges and incorporates herein the allegations above.

55.  HAND OUT had, and continues to have, an economic relationship with the investors, organizers, and/or participants of the television series *Shark Tank™*, including Barbara Corcoran, as well as the consuming public in general who purchase HAND OUT's products.

56.  HAND OUT's relationship with the investors, organizers, and/or participants of the television series *Shark Tank™*, including Barbara Corcoran, as well as the consuming public in general who purchase HAND OUT's products, has been of economic benefit to HAND OUT

and, prior to Defendants' conduct described herein, had a high probability of being of further economic benefit to HAND OUT.

57. Defendants had knowledge of HAND OUT's economic relationship with the investors, organizers, and/or participants of the television series *Shark Tank™*, including Barbara Corcoran, as well as the consuming public in general who purchase HAND OUT's products.

58. Defendants' conduct and statements about HAND OUT and its owners and/or officers, including but not limited to their communications with Barbara Corcoran, were intentionally designed to disrupt HAND OUT's economic relationship with the investors, organizers, and/or participants of the television series *Shark Tank™*, including Barbara Corcoran, as well as the consuming public in general who purchase HAND OUT's products, and to cause economic harm to HAND OUT.

59. Defendants' purpose in interfering with HAND OUT's economic relations was both for an improper purpose—i.e., to injure HAND OUT—and used improper means at least in that Defendants misrepresented facts, used defamation and/or disparaging falsehoods, and in that Defendants' actions in interfering with HAND OUT's economic relationships were contrary to both statutory and common laws.

60. Non-limiting examples of statements constituting improper means to unlawfully interfere with HAND OUT's economic relations from Defendants are as follows:

- "Now I see these guys, Jake and Don, going onto Shark Tank and taking credit for my invention, as if they came up with it themselves."

- "Don Wildman has $100M and these gloves aren't already in every store, everywhere? BS."

Case 2:17-cv-00052-PMW   Document 2   Filed 01/19/17   Page 15 of 18

- "I wanted to let you know that these guys are dishonest and that they lied to you, and everyone else watching, that they came up with this idea, and that they will be able to get a patent, they absolutely, definitely will not."

61. On information and belief, Defendants knew or should have known that their statements and conduct would result in disruption of HAND OUT's economic relationships with, for example, Barbara Corcoron, and would result in immediate and substantial harm to HAND OUT.

62. As a direct and proximate result of Defendants' actions, HAND OUT has sustained and will continue to sustain, substantial injury, loss, and damages in an amount to be proven at trial, along with HAND OUT's attorneys' fees and costs.

63. As a direct and proximate result of Defendants' conduct, HAND OUT has been irreparably harmed and will continue to suffer irreparable harm unless Defendants are restrained from continuing in such actions.

64. HAND OUT has no adequate remedy at law that will compensate it for the continued and irreparable harm it will suffer if Defendants' conduct is allowed to continue.

**THIRD CLAIM FOR RELIEF**
**(DEFAMATION)**

65. HAND OUT hereby realleges and incorporates herein the allegations above.

66. Defendants published one or more false statements that specifically referred to HAND OUT, HAND OUT's investors and/or officers, and/or HAND OUT's products.

67. Defendants also published one or more false statements that derogated and disparaged HAND OUT's products, investors and/or officers, and/or business.

68. Non-limiting examples of false and disparaging statements from Defendants are as follows:

Page 15 of 18

- "He [Jake Sullivan] will be known as a thief, and very dishonest."

- "Sorry, Jake [Sullivan] and Don [Wildman], you guys are lower than low to try and claim my invention as your own. How dumb can you be? These gloves have been being sold for over a decade, you think it will fly that you came up with the idea."

- "It will be tough when all you friends and family, who don't already know that you stole it from me, find out about how dishonest you have been."

- "So lying to Shark Tank, lying to all who watched the show, lying to everyone who thinks it is their idea, I am just exposing them."

- "I saw their [HAND OUT's] gloves at REI. [HAND OUT's more expensive gloves are] my design 100%."

- "They [HAND OUT] cut corners and are selling a crappy product . . . ."

- "Jake Sullivan is not a trustworthy person, and that Don Wildman does not have the money he says he does . . . ."

- "[T]hey will NOT be able to get a patent on these gloves, it is already out there and in the market"

- "Now I see these guys, Jake and Don, going onto Shark Tank and taking credit for my invention, as if they came up with it themselves."

69. Neither of the Defendants had a privilege to make any of the false and defamatory statements referenced herein.

70. On information and belief, Defendants intended to cause financial harm to HAND OUT by making the false and defamatory statements referenced herein.

71. On information and belief, Defendants knew, or should have known, that the false and defamatory statements referenced herein were false.

72. At the very least, Defendants acted with reckless disregard for the truth in making and publishing the false and defamatory statements referenced herein.

73. As a direct and proximate result of Defendants' actions, HAND OUT has sustained and will continue to sustain, substantial injury, loss, and damages in an amount to be proven at trial, along with HAND OUT's attorneys' fees and costs.

74. HAND OUT has no adequate remedy at law that will compensate it for the continued and irreparable harm it will suffer if Defendants' conduct is allowed to continue.

**PRAYER FOR RELIEF**

WHEREFORE, HAND OUT respectfully requests that this Court enter judgment against Defendants as follows:

1. That preliminary and permanent injunctions be issued enjoining Defendants, along with their respective employees, agents, successors and assigns, and all those in active concert and participation with them, and each of them who receives notice directly or otherwise of such injunctions, from making any further false, misleading, or disparaging statements regarding HAND OUT, its owners/investors, or its products, or from otherwise interfering with any of HAND OUT's existing or prospective economic relations.

2. For an order directing Defendants to issue a formal, public retraction and correction of each of their false, misleading, or disparaging statements.

3. For an order directing that Defendants file with the Court and serve upon HAND OUT's counsel within thirty (30) days after entry of such judgment, a report in writing under

oath, setting forth in detail the manner and form in which Defendants have complied with the above.

4. For an order requiring Defendants to file with the Court and provide to HAND OUT an equitable accounting and disgorgement of all revenues and/or profits wrongfully realized by Defendants as a result of their wrongful conduct.

5. For an award pursuant to 15 U.S.C. § 1117, including disgorgement of all revenues and/or profits wrongfully derived by Defendants, damages sustained by HAND OUT, and HAND OUT's reasonable attorney fees and costs.

6. For an award of interest, including prejudgment interest on the foregoing sums.

7. For such other and further relief as the Court may deem just and proper.

DATED: January 19, 2017

By: /s/ Matthew D. Thayne

Matthew D. Thayne
PHILLIPS RYTHER & WINCHESTER
*Attorneys for Plaintiff*
*Hand Out Gloves LLC*